UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Steven Dion Kellum,

       Plaintiff,

v.                                                                         Civil No. 11-2135 (JNE/TNL)
                                                                      ORDER

Danielle Bree Evans, Daniel Steven Anderson,
and Richard Ross Taylor, acting in their
individual capacities as officers of the Minneapolis
Police Department, and City of Minneapolis

       Defendants.

      Plaintiff Steven Kellum ("Kellum") brought suit against Defendants Officer Danielle Bree Evans ("Evans"), Officer Daniel Steven Anderson ("Anderson") and Officer Richard Ross Taylor ("Taylor"), alleging excessive force claims under 42 U.S.C. § 1983 and state-law claims of battery. Kellum also brought claims against the City of Minneapolis ("City") pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and *City of Canton v. Harris*, 489 U.S. 378 (1989). Defendants have moved for summary judgment on all claims.[1]

I.    **BACKGROUND**[2]

      At approximately 5:11 p.m. on December 4, 2009, the Minneapolis Police Department ("MPD") received a report that a black 2007 BMW with license plate UYT671 had been stolen.

---

[1]     Kellum concedes the *Monell* claim against the City. *See* Pl.'s Mem. Opp. 1 (ECF No. 23). Because he also presents no evidence and makes no argument regarding his failure-to-train claim against the City, this claim is deemed waived. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 756 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). Kellum also fails to address the battery claim, and he makes no argument and presents no evidence of malice to defeat Defendants' claims of official immunity. The battery claim, too, is therefore deemed waived. Even if not waived, the battery claim would fail for the same reasons as the excessive force claims, discussed below.

[2]     The facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Kellum.

1

The BMW was equipped with a GPS tracking device, which enabled the MPD officers to locate the vehicle. Officers Anderson and Evans, in squad car 412, and Officers Taylor and Gretchen Bloss ("Bloss"), in squad car 430, were dispatched to respond to the stolen vehicle incident. While the officers were en route, MPD dispatch reported that the suspect driving the stolen BMW had physically assaulted a restaurant employee earlier in the evening. MPD dispatch subsequently reported that the BMW was traveling southbound on Cedar Lake Road. Officers Evans and Anderson were traveling northbound on Cedar Lake Road, with Officers Taylor and Bloss following close behind them.

While traveling northbound, Officer Anderson observed a vehicle traveling southbound with BMW-style headlights. The BMW pulled over to the curb along the west side of the street and came to a stop behind a parked Nissan. Officer Evans stopped squad 412 in a north-facing position roughly parallel with the parked BMW and activated the squad's emergency lights. Officers Taylor and Bloss arrived a few seconds later and parked behind Evans and Anderson. Anderson confirmed that the license plate number of the stopped vehicle matched that of the stolen BMW. He exited squad 412 from the passenger's side, drew his handgun, and commanded the driver of the BMW to get out of the vehicle and show his hands. Officer Evans exited squad 412 from the driver's side so that she was between her squad car and the BMW. She drew her weapon and ordered the driver to put up his hands. Officer Taylor exited squad 430 from the passenger's side and drew his weapon, commanding the driver to show his hands. Officer Bloss also exited squad 430, from the driver's side, so that she was standing between the stopped squad car and the parked Nissan.

Below is a Court-generated diagram, not drawn to scale, that generally depicts the location of the parties at the time of the incident:

2



Kellum, who was driving the BMW, did not comply with any of the officers' commands or acknowledge their presence in any way. Instead, he gripped the steering wheel and stared straight ahead. He then began driving, pulling away from the curb and navigating the BMW toward the narrow space between the parked Nissan and squad 430. The officers yelled, "stop the car," but Kellum did not obey their commands. Kellum, driving approximately five or ten miles per hour, collided with the squad car and the Nissan. The collision did not stop his vehicle, and Kellum continued to push past the parked cars. Officer Bloss, who was standing near the driver's side door of squad 430 and between the squad car and the Nissan, was in the direct path of the moving BMW.

Officers Anderson and Taylor both saw that the BMW was moving toward Bloss's position and believed that Bloss was in danger. Officer Taylor saw the BMW's headlights shining on Bloss. Officer Evans heard another officer yell, "he's going to hit her!" and then saw

Bloss in the path of the BMW.  By this time, Officers Anderson and Taylor had moved toward the front of squad 430.  Officers Anderson, Taylor and Evans fired their weapons at Kellum, each firing two or three times in rapid succession.  Officers Anderson and Taylor testified that they fired their weapons because they believed the BMW was going to hit Officer Bloss.  Officer Evans testified that at the time she discharged her firearm, she believed that the BMW had, in fact, hit Bloss, and she believed Kellum was going to kill another officer with the BMW.  Bloss reported that the BMW came within five feet of her position before she began moving out of its path.  Because she was between the parked Nissan and squad 430, she could not simply turn and run, but instead retreated around the front of the Nissan to a position on the grass along the west side of the road.  She, too, had been afraid that the BMW was going to run her over.

Kellum continued to drive the BMW through the space between the Nissan and squad 430.  He then accelerated, jumped a curb and crashed into a large tree.  Officers Anderson and Taylor approached the driver's side door of the BMW and observed that Kellum appeared to be unconscious.  Kellum was handcuffed and brought to the hospital, where he received medical treatment and underwent surgeries for gunshot wounds to his forearm and head.[3]

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need

---

[3]  A blood test performed at the hospital revealed that Kellum had a blood alcohol level of 0.199 g/dL.

consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The nonmoving party must substantiate his allegations by "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotation marks omitted).

Kellum asserts § 1983 claims against Officers Evans, Anderson and Taylor in their individual capacities.  Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.  Because § 1983 is "not itself a source of substantive rights," a court addressing a claim pursuant to § 1983 must "identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  Kellum alleges that the officers' use of deadly force in discharging their firearms violated his constitutional right to be free from excessive force.  Defendants contend that they are entitled to qualified immunity and that the force they used was objectively reasonable.

"Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (citing *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)). "To defeat a claim of qualified immunity, a plaintiff alleging excessive use of force must present sufficient facts to show that the officer's conduct violated a constitutional right, and he must also establish that the constitutional right was clearly established." *Id.* Under the Fourth Amendment objective reasonableness standard, the appropriate inquiry is whether the "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct." *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (citations omitted).

At the time the officers stopped Kellum, he was suspected of having stolen a vehicle and physically assaulting a restaurant employee. When the officers fired their weapons, Kellum had already crashed the BMW into one of the squad cars and continued driving the BMW toward a nearby officer. These crimes, when taken together, were severe. Kellum also admits that he was actively resisting arrest, characterizing his actions as "a feeble attempt to flee the scene." Pl.'s Mem. Opp. 3 (ECF No. 23). It is undisputed that Kellum did not acknowledge the officers and did not respond to any of their requests to exit the vehicle, put his hands in the air, or stop the vehicle after he had pulled away from the curb toward squad 430 and Officer Bloss.

The only factor Kellum disputes is whether or not he posed a threat to the safety of the officers or others. He asserts that Defendants' belief that he posed a threat was unreasonable. But it is undisputed that Kellum ignored the officers' commands to stop and exit the vehicle; that he accelerated the vehicle to approximately five or ten miles per hour; that he steered the vehicle in the direction of squad 430; that he crashed into the squad car and the parked Nissan; that he accelerated with enough force to push past the parked cars into which he had crashed; that he continued driving in Officer Bloss's direction; and that immediately before discharging their firearms, Defendants observed Officer Bloss in the path of the moving BMW.[4]

Kellum emphasizes that this was not a "high-speed chase," but rather he was driving only five or ten miles per hour when he pulled away from the curb and collided with the squad car. Compared with vehicle speeds that police officers sometimes encounter, the Kellum-driven vehicle was, indeed, a "slow-moving tortoise." But this "tortoise" was a heavy two-ton vehicle capable, presumably, of rapid acceleration and headed for—not away from—a uniformed officer. The Court must therefore respectfully disagree that the vehicle's speed shows that it posed no threat to Officer Bloss. *See United States v. Yates*, 304 F.3d 818, 823 (8th Cir. 2002) ("A car or truck may be used as a deadly or dangerous weapon."). There is nothing in the record to suggest that Kellum would not have further accelerated if given the opportunity to do so or that the officers should have expected Kellum to continue fleeing at a speed of only five miles per hour. The officers were not required to wait until after Kellum had achieved a faster speed before determining that his actions posed a danger to Officer Bloss. Further, Kellum acknowledges that

---

[4] Kellum notes that because at least some of the officers saw his hands on the steering wheel, they must have known he was unarmed. But the mere placement of his hands did not provide any indication as to whether he possessed a weapon. Further, the vehicle itself, as Kellum used it, constituted a deadly weapon. *See United States v. Dawn*, 685 F.3d 790, 795 (8th Cir. 2012) (stating that "a vehicle can constitute a 'deadly weapon'").

he continued to drive after colliding with the squad car and the Nissan. He therefore applied sufficient force to push past these two impediments and proceed in Bloss's direction through the narrow space between the parked vehicles. Moreover, there is no evidence that a BMW traveling at only five or ten miles per hour is incapable of causing great bodily harm to a person in its path.[5]

Kellum next points to the fact that Officers Taylor, Anderson and Evans had sufficient time to move into a different position after he began pulling away from the curb. He contends that this fact undermines their belief that Officer Bloss was in danger, because the officers should have known that she, too, would have time to dodge the oncoming vehicle. The other officers, however, were not standing in the direct path of the moving vehicle, and they were not sandwiched between two parked cars. There is nothing to suggest that the officers should have known that Officer Bloss—who was in a significantly different position than the others—would have time to retreat from the path of the oncoming BMW. Even if the officers should have believed Officer Bloss would have time to move, there is no evidence to suggest that they should have believed she would have time to move *to a position of safety*. Even Bloss stated that the BMW came within five feet of her position before she began moving out of its way.

Kellum next argues that Officer Evans could not have reasonably believed that he posed a threat to Officer Bloss because at the time Evans discharged her firearm, she believed that Kellum already *had* hit Bloss with the car. Kellum asserts that if Evans thought he already hit

---

[5] The Court notes that, according to a National Highway Traffic Safety Administration report, one study showed that at impacts of only twenty miles per hour, 5% of the struck pedestrians died and another 65% were injured. *See* U.S. Dep't of Transportation, Nat'l Highway Traffic Safety Admin., Literature Review on Vehicle Travel Speeds and Pedestrian Injuries (1999), *available at* http://www.nhtsa.gov/people/injury/research/pub/HS809012.html. Another study revealed that at speeds of less than twenty miles per hour, approximately one-third of struck pedestrians suffered incapacitating or fatal injuries. *Id.*

Bloss, then she could not believe that he continued to pose a threat to Bloss or the other officers. But there is no evidence that Evans believed or should have believed that once Officer Bloss was hit, Kellum no longer posed a threat. A suspect who hits an officer with his vehicle can continue to threaten the life of that same officer, as well as the other officers on the scene. Kellum also appears to suggest that Evans fired her weapon as a means of levying judgment on him for supposedly hitting Bloss, but there is no evidence in the record to support this suggestion. The fact that Evans believed Kellum already had injured or killed an officer makes her belief that he posed a threat *more* reasonable, not less.

  Finally, Kellum contends that even if the officers were each justified in firing one round at him, they were not justified in firing subsequent shots because, without searching for Bloss between shots, they did not *know* if Bloss was still in danger. All of the shots were fired within a matter of seconds. Kellum offers no legal authority to support the proposition that once the officers determined that Kellum posed a threat and deadly force was necessary to protect another officer, they were required to pause and reevaluate the situation in the moments between each shot, especially with no indication that the first shot abated the threat. Before any of the officers discharged their weapons, Bloss *was* in the direct path of the oncoming BMW, each of the officers observed Bloss in that position, and they each believed that Bloss's life was in danger. There is no evidence that anything transpired between the time that the officers took their first and second shots that should have provided them with notice that Bloss was no longer in danger. Given the last known location of Bloss, the direction in which the BMW was moving, and the rapid sequence of events, there is nothing to contradict the officers' belief that Bloss remained in

danger or to suggest that their belief was unreasonable.[6]

Kellum contends that the reasonableness of the officers' beliefs is a jury question and the officers can argue at trial that they are entitled to qualified immunity. But there are no disputed material facts that bear on the immunity analysis. It is undisputed that Kellum was driving a stolen vehicle; the officers were aware that the driver was suspected of having assaulted a restaurant employee; Kellum ignored the officers' commands; he pulled away from the curb and collided with a squad car; he continued to drive toward Officer Bloss; and each of the three defendant officers saw Bloss standing in the path of the car driven by Kellum. Even if the officers were mistaken in their belief that Bloss—hemmed in by cars on either side and in the direct path of the oncoming BMW—was in danger, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"Qualified immunity is '*immunity from suit* rather than a mere defense to liability.'" *Robbins v. Becker*, 715 F.3d 691, 693 (8th Cir. 2013) (quoting *Hunter*, 502 U.S. at 227). "Immunity ordinarily should be decided by the court long before trial." *Hunter*, 502 U.S. at 228. "[W]hether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir.

---

[6] Kellum offers the affidavit of expert W. Ken Katsaris, who ultimately concluded that "[t]he shooting of Steven Kellum appears to be about his fleeing from the stop, not because he was a reasonable threat of Officer Gretchen Bloss." Fundingsland Aff. Ex. 20, at 10. There is no factual basis to support this conclusion and Katsaris fails to consider the incident from the perspective of the three defendant officers. For example, he states that Officer Bloss did not perceive the BMW as a threat. It is not Officer Bloss's perception that is at issue in this case. Further, this conclusion is squarely contradicted by the statement upon which Katsaris relied, in which Officer Bloss stated, "I was afraid the car was going to run me over and I observed the car coming forward." *Id.* Ex. 29. Kellum highlights Katsaris's conclusion that the officers' use of force was unreasonable. This, however, is a matter of law for the Court to decide. *See Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). Katsaris's report does not create a genuine dispute of material fact regarding the objective reasonableness of the Defendants' use of force.

2000) (internal quotation marks omitted). Summary judgment is inappropriate only if Kellum demonstrates that "a genuine dispute exists concerning predicate facts material to the qualified immunity issue." *Id.*

> [O]nce the predicate facts have been established, for the purposes of qualified immunity there is no such thing as a "genuine issue of fact" as to whether an officer "should have known" that his conduct violated constitutional rights. The conduct was either "reasonabl[e] under settled law in the circumstances" or it was not, and this is a determination of law that should be made at "the earliest possible stage in litigation." . . . [W]hether an officer "acted reasonably under settled law in the circumstances" is a question of law, and not itself a predicate fact. "Predicate facts" include only the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions. When there is no dispute among the parties as to the relevant facts, as is the case here . . . , a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity—that is, whether or not the officer acted reasonably under settled law given the particular set of facts.

*Id.* (citations omitted). Here, all the predicate facts have been established and are undisputed. In the qualified immunity context, whether the officers acted reasonably under the circumstances is a question of law for the Court, not the jury, to decide. The Court concludes that they did.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "[I]f . . . there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12. Each defendant here had probable cause to believe that Kellum either inflicted or threatened to inflict serious physical harm; their use of force was not constitutionally unreasonable.[7] "Given the quickly evolving

---

[7] The fact that Kellum purposely drove the BMW directly into an officer's vehicle may alone have been sufficient to provide the officers with probable cause to believe Kellum posed

11

scenario, the officers' actions in shooting [Kellum] in an attempt to stop him from injuring the officer[] in his path was objectively reasonable and did not violate [Kellum's] Fourth Amendment right to be free from unreasonable seizures." *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 526 (8th Cir. 2007); *see also Molina-Gomes v. Welinski*, 676 F.3d 1149, 1152-53 (8th Cir. 2012) (stating that the "reckless driving" by the plaintiff "in his attempt to escape was a danger to the arresting police officers and to any drivers on the roadway," and that the officer's "use of force under these quickly evolving dangerous actions by [the plaintiff] was 'objectively reasonable under the circumstances as [the officer] perceived them'" (citation omitted)). Officers Evans, Anderson and Taylor are entitled to qualified immunity.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 13] is GRANTED.

2. Summary judgment is granted in favor of Defendants on all claims.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 6, 2013

                                                         s/Joan N. Ericksen
                                                         JOAN N. ERICKSEN
                                                         United States District Judge

---

an imminent threat of serious physical harm to himself and to others. *See Hernandez v. Jarman*, 340 F.3d 617 (8th Cir. 2003) (finding the officer's use of deadly force objectively reasonable because he had probable cause to believe that the suspect "posed an imminent threat of serious physical harm to himself and to others as evidenced by [the suspect] driving head-on" into an officer's vehicle). But Kellum did not simply collide with a squad car—he continued to push past the squad car directly toward where another officer was standing.